UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| | : | |
| BRANDY & TERRY CHRISTIANSEN, Plaintiffs, | : | |
| | : | |
| vs. | | No. 2:14cv00025 |
| | : | |
| WEST VALLEY CITY, *et al.*, Defendants. | : | Report of Kenneth R. Wallentine |
| | : | |

The following report of Kenneth R. Wallentine is submitted after review of the following documents, pleadings, records, and reports:

Plaintiffs' Civil Complaint

West Valley City Police incident report no. 12I049139

West Valley City Police Policy Manual

West Valley City Police Narcotics Division Guidelines

Deposition of Thayle Nielsen

Deposition of Terry Christiansen

Deposition of Brandy Christiansen

Deposition of John Coyle

Deposition of Sean McCarthy

Deposition of Barbara Lund

*Christiansen v. West Valley City, et al.*
*Report of Kenneth R. Wallentine* 1

  Deposition of Steven Beardshall

Kenneth R. Wallentine states as follows:

In the instant matter, I have relied upon the documents, diagrams, pleadings, records, reports, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein. Those opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

**A. Summary of reported information:**

On the afternoon of October 26, 2012, a person told West Valley City Police Officer Jason Vincent that the person had been at 1512 West Claybourne Avenue and had seen marijuana in plain view in the residence. The person also told Officer Vincent that there was additional marijuana inside a white car and identified a part of the Wyoming license plate number. Officer Vincent shared this information with Detective Sean McCarthy. Detective McCarthy knew this to be the home of Larry Miller, a person with a significant history of involvement in illegal drugs.

Detective McCarthy, Lieutenant John Coyle and Detective Ricardo Franco went to the Miller residence. Detective McCarthy saw a white car with a Wyoming license plate that bore the numbers provided to him by Officer Vincent. Detective McCarthy saw a woman later identified as Brandy Long or Brandy Christiansen moving items in and out of the car. He spoke with her and asked whether Larry was at home. She told Detective McCarthy that he was inside.

Detective McCarthy, accompanied by Lieutenant John Coyle, went to the door to conduct a

knock-and-talk investigation. Detective Franco stayed outside and spoke with Brandy Christiansen. Larry Miller came to the door, asked what the visit was about, and allowed Detective McCarthy and Lt. Coyle to enter. In response to Detective McCarthy's request, Larry Miller called two guests, Steven Jenkins and Terry Christiansen into the kitchen area. Knowing about outstanding warrants for his arrest, Christiansen falsely identified himself as Travis Christiansen.

Detective McCarthy told Miller and the other two men that he was there to investigate a report of drug sales at the residence. Miller denied knowing anything about that. Detective McCarthy and Lt. Coyle perceived changes of behavior in Jenkins and Christiansen. Jenkins began to manipulate something in his pocket. Detective McCarthy told Jenkins to stand up so that Detective McCarthy could frisk him.

As Jenkins started to stand, Christiansen reached toward his waist. Detective McCarthy feared that he was reaching for a weapon and he drew his gun and ordered Christiansen to raise his hands. Lt. Coyle shouted at Christiansen to stop and to show his hands. Lt. Coyle could see that Christiansen was holding a small glass vial, such as those commonly used to hold illicit drugs.

Christiansen stood and ran toward the back of the residence. Lt. Coyle followed. Detective McCarthy held Miller and Jenkins in the kitchen. Detective McCarthy pushed the emergency signal button on his portable radio and called for help.

Lt. Coyle tackled Christiansen in the hallway, just outside the bathroom. Christiansen broke free and stood in the doorway of the bathroom. He tried to strike Lt. Coyle. As he swung, Lt. Coyle saw something shiny in his hand. Lt. Coyle saw that it was a knife and he felt the blade cut him as Christiansen swung at him. Christiansen swung again and Lt. Coyle dodged. Christiansen’s hand hit the door frame and he dropped the knife.

Lt. Coyle applied a carotid control hold to Christiansen. Right about then, Officer Steven Beardshall ran into the residence, followed by Officer Barbara Lund. Christiansen tried to break free from Lt. Coyle and he tried to drop the vial into the toilet. Both officers were shouting commands at Christiansen to stop fighting. He continued to try to hit the officers and to escape. Christiansen was able to get the vial into the toilet and he tried to flush it with his foot. Christiansen fought against the officers efforts to detain him and he ignored their repeated commands.

Officer Beardshall and Lt. Coyle forcefully pulled Christiansen’s arms into position for handcuffing. Christiansen would not walk and the officers had to drag him to the next room. Christiansen continued to kick and flail, so the officers held him down and placed shackles on his feet.

Christiansen was taken to a medical facility for evaluation and clearance for jail booking. Detective David Greco interviewed Christiansen in the treatment room. Christiansen appeared to be under the influence of some substance. He told Detective Greco that he was under the influence of methamphetamine. He denied having a knife or striking Lt. Coyle, and said that he was just trying to get away.

Steven Jenkins told Detective McCarthy that he was at Millers residence to use methamphetamine and to get high. Jenkins told Detective McCarthy that Terry Christiansen had consigned some marijuana to him to sell, but that he brought it back to Christiansen. Jenkins said that he thought that there was marijuana in a cooler in the Chrysler 300, the same car that Brandy Christiansen had been loading and unloading when the officers arrived.

Christiansen spoke briefly with Detective McCarthy at the county jail. Christiansen told Detective McCarthy that he had lied about his identity just to fuck with you guys. The officers

determined that Christiansen was wanted on felony fugitive warrants from California. Christiansen apologized to Detective McCarthy, saying I know I fucked up back there and Im sorry for what I did.

**B. The detention of Terry Christiansen was reasonable and was consistent with generally accepted policies, practices and training for police.**

1. The encounter between Detective McCarthy, Lt. Coyle and Terry Christiansen began as a consensual exchange when Terry Christiansen came from the back of Larry Millers residence the kitchen area.   Detective McCarthy explained that the officers were there to talk about illegal drug distribution.   Not until Steve Jenkins and Terry Christiansen tried to manipulate and conceal their contraband did the officers give any commands consistent with a detention.

2. A reasonable and well-trained officer would have ordered Terry Christiansen to show his hands once Christiansen moved his hands toward his waistband (a common location for concealed weapons) and began to furtively squirm and try to dispose of the methamphetamine that he was holding.   A reasonable and well-trained officer would interpret Terry Christiansen's movements toward his waistband as a probable reach for a weapon and would draw his gun and immediately command Christiansen to raise his hands.   In so doing, Detective McCarthy actd consistently with generally accepted police training and practice.   Lt. Coyle shouted at Christiansen to stop and to show his hands.

3. From his viewing perspective, Lt. Coyle could see that Terry Christiansen was taking a glass vial, such as those commonly used to contain illegal drugs, out of his waistband. Christiansen's vial, in fact, contained illegally-possessed methamphetamine.   A reasonable and well-trained officer would have detained Terry Christiansen and seized the

vial.

4. Lt. Coyle and Detective McCarthy each commanded Terry Christiansen to stop moving his hands and to show his hands. Christiansen did not comply; instead he bolted from the room. Lt. Coyle followed and grabbed Christiansen to detain him and to seize the vial of illegal drugs. Terry Christiansen disregarded the officers attempts to detain him.

**C. The force used to detain Terry Christiansen was consistent with generally accepted policies, practices and training for police officers.**

1. When Lt. Coyle grabbed his arm, Christiansen pulled away and Lt. Coyle tackled him in the hallway. Christiansen broke free and stood in the doorway of the bathroom. As Lt. Coyle stood, Christiansen swung at him with a knife. Lt. Coyle raised his hand to block the blow and Christiansen slashed Lt. Coyle's thumb.

2. A reasonable and well-trained officer would have used the force necessary to stop Terry Christiansen from continuing his potentially-deadly knife attack. Lt. Coyle applied a carotid control hold. Terry Christiansen dropped the vial of drugs into the toilet bowl and momentarily went limp. Lt. Coyle and Christiansen fell and hit the toilet. Christiansen continued to fight and kick and thrash.

3. Officer Beardshall arrived and helped Lt. Coyle gain control of Christiansen. A reasonable and well-trained officer would have promptly attempted to secure Christiansen in handcuffs. They did so, assisted also by Officer Lund.

4. Even handcuffed, Christiansen continued to violently kick at the officers. Officer Lund held his legs while the officers applied leg shackles. Forcefully holding Christiansen down and applying shackles helped prevent further injury to the officers and to Christiansen. The application of handcuffs and shackles was consistent with generally

accepted practices and training for police officers dealing with a violently-resisting subject.

**D. The detention of Brandy Christiansen was reasonable and was consistent with generally accepted policies, practices and training for law enforcement officers.**

1. When initially contacted by the Detective McCarthy, Brandy Christiansen was outside the residence and was physically separated from those inside the residence. Officers engaged in a knock-and-talk investigations are trained to control the entire scene insofar as possible. At a residence, officers are trained to control ingress and egress during the investigation, in order to promote an efficient investigation and the safety of all persons present. Consistent with their training and generally-accepted police procedure, Detective Ricardo Franco remained outside with Brandy Christiansen while Detective McCarthy and Lt. Coyle went to the door and knocked.

2. Brandy Christiansen was moving items in and out of a car that had been reported by Officer Vincent's informant to be the car associated with distribution of illegal drugs. The informant stated that the car contained bricks of marijuana. This was also the car that Steven Jenkins said contained a cooler that might contain marijuana. The investigation lead to probable cause to believe that the residents were involved in various drug crimes, including constructive possession of the marijuana and other illegal drugs found in the residence. Brandy Christiansen was detained and subsequently arrested.

3. Brandy Christiansen stated that she was searched by more than one officer at the scene. Officers are taught that each officer who has custody of a detained person is responsible for maintaining control of that person. Officers commonly search the area, such as a car seat or chair cushions, where a detained person is placed before and after the person is placed there. Officers also commonly search the detained person upon transfer of custody. It

    was reasonable for the various officers watching over Brandy Christiansen to conduct a pat search at the time each one assumed custody.

4. It is often not feasible to have a male officer keep custody of a male detainee or a female officer keep custody of a female detainee.   Officers are taught to conduct pat searches of detainees and arrestees of the opposite sex.   Officers are taught that weapons and contraband are frequently concealed in areas such as the groin and around female breasts because criminals believe that discovery is less likely.   Police training at the Utah Police Academy includes instruction, demonstration and practice of pat searches around the areas likely to conceal contraband and weapons, including the groin, buttocks and female breasts.   It was consistent with police training and generally-accepted police procedure to conduct a thorough pat frisk of Brandy Christiansen.

In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.   A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

**E. My qualifications as an expert in this subject matter include the following:**

I am a law enforcement officer in the State of Utah.   I became certified as a law enforcement officer in the State of Utah in 1982.   Until April 1, 2014, I was employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.   I retired from that position in 2014 and currently serve as a reserve Special Agent.   I remain certified as a law enforcement officer in Utah.   I am currently the Vice-President and Senior Legal Advisor for Lexipol and am in practice as a private consultant.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of

improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians. I commanded the State of Utah Child Abduction Response Team. I commanded the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governors Leadership in Public Service award for my work in public safety leadership.

I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and

worked with the Uintah County Sheriffs K9 Unit from 1995 to 2001.   I continue to provide instruction and evaluation services for the POST Police Service Dog program.   I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms courses.   I am certified by the Force Science Research Center as a Force Science Analyst .   I am a certified TASER Instructor.   I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

   I am a licensed attorney, having practiced law since 1990.   I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah.   I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court.   I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities.   I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

   I consult and provide expert witness opinions on police procedures, and use of force issues.   I perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise.   I am a consultant to the Utah Risk Management Mutual Association, the states largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.   I am the co-founder of, and legal advisor to, a best practices advisory group that developed

comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs Association and various state law enforcement agencies.  These policies serve as a model for all Utah public safety agencies.  I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies.  I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

I participate and serve in a number of community and professional capacities.  Professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-Chairman of the Utah Law Enforcement Legislative Committee.  I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training.  I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland

Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups. I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

I am Vice-President and Senior Legal Advisor for Lexipol, Inc., the nations largest provider of policy formulation and revision for public safety agencies and policy-based training, responsible for reviewing and editing the work of legal staff in creation of policy manuals for law enforcement agencies. In that capacity, I have assisted in the drafting and review of use of force and police service dog policies in current use by more than 1,600 police agencies and correctional facilities in the United States.

**F. My publications (limited to ten years) include the following:** I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officers Legal Handbook*, 2nd ed., was published by Lexis/Nexis Matthew Bender in February 2014. It includes an extensive discussion of use of force by police officers. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure*

*for Police, Prosecutors, and Defenders,* was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers. My other published works, limited to the past ten years, include: *Electronic Restraints: Do They Shock the Conscience?,* The Sheriff (in editing); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014); *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in CyberInvestigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?,* The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cops Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer,* The Municipal Lawyer, January 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004. I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as

other police academies throughout the United States, titled *Criminal Procedure: The Street Cops Guide* (Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

**G. My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,000.00 for deposition or court testimony. I bill for actual travel expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

**H. My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness. I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Frasier v. McCallum, et al.*, No. 1:14cv00009MP-GRJ, United States District Court for the Northern District of Florida, 2015. Deposition testimony given on behalf of defendant. Subject matter: mistaken arrest. *Wolffis v. City of Gainesville*, No. 1:14cv130, United States District Court for the Northern District of Florida, 2015. Deposition testimony given on behalf of defendant. Subject matter: excessive force. *Castillo v. City of Tempe*, No. 2:12-CV-02225-ROS, United States District Court for the District of Arizona, 2015. Trial testimony given on behalf of defendants. Subject matter: excessive force. *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2015. Trial and deposition testimony given on behalf of the

defendants. Subject matter: police force to effect arrest. *Williams v. TASER, Internat'l and the City of Charlotte*, No. 3:12CV838, United States District Court for the Western District of North Carolina, 2014. Trial and deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Ali v. City of Tempe*, No. CV2013-091264, Superior Court, State of Arizona, Maricopa County, 2014. Deposition testimony given on behalf of defendants. Subject matter: excessive force. *Texiera v. United States of America, et al.*, No. 2:11-CV-02022, United States District Court for the District of Nevada, 2014. Trial and deposition testimony given on behalf of the defendants. Subject matter: police canines. *Clark v. Box Elder County et al.*, No. 1:13-cv-00079-CW, United States District Court for the District of Utah, 2014. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Chief v. West Valley City Police, et al.*, No. 2:11-CV-643, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Campbell & Gemperline v. City of Springboro et al.*, No. 1:08-cv-00737, United States District Court for the Southern District of Ohio, 2013. Deposition testimony given on behalf of the defendants. Subject matter: police canines. *Thompson v. City of Lebanon*, No. 1:10-CV-0035, United States District Court for the Middle District of Tennessee, 2013. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Boggs v. City of Waterloo*, No. LACV116584-CW, Blackhawk County District Court, 2013. Deposition testimony given on behalf of defendants. *Schmidtke v. Marion County Sheriff et al.*, No. 5:10-CV-293-OC- 10prl, United States District Court for the Middle District of Florida, 2012. Deposition testimony given on behalf of the defendants. *Alusa v. Salt Lake County Sheriff, et al.*, No. 2:11-CV-00184-CW, United States District Court for the District

of Utah, 2012. Deposition testimony given on behalf of the defendants. *Woodward v. City of Gallatin, et al.*, No. 3:10-CV-01060, United States District Court for the Middle District of Tennessee, 2012. Deposition testimony given on behalf of the defendants. *Minor v. Johnson, et al.*, No. 1016-CV08762, Circuit Court of Jackson County, Missouri, 2012. Deposition testimony given on behalf of defendants. *Garcia v. Sacramento City, et al.*, No. 2:10-CV-00826-JAM-KJN, United States District Court of California, Eastern Division, 2012. Deposition testimony given on behalf of the defendants. *Cavanaugh v. Woods Cross City, et al.*, No. 1:08CV00032, United States District Court of Utah, Central Division, 2011. Trial testimony given on behalf of the defendants. *Ibarra v. City of Watsonville*, Watsonville Municipal Civil Service Commission, 2011. Trial testimony given on behalf of Respondent. *Jones v. City of Waterloo*, No. 6:10-CV-02014-LRR United States District Court of Iowa, 2011. Trial testimony given on behalf of the defendants. *Cardall v. Thompson, et al.* Case No. 2:10CV00305CW, United States District Court of Utah, Central Division, 2011. Deposition testimony given on behalf of defendants.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, deposition testimony, consideration of any report submitted by plaintiffs' experts, further investigation and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in

this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

**CONCLUSION**

The officers had probable cause to detain and arrest Brandy and Terry Christiansen. Their detention was reasonable and was consistent with generally accepted policies, practices and training for police. The force used to detain Terry Christiansen was reasonable and was consistent with generally accepted policies, practices and training for officers struggling with a resisting subject.

Kenneth R. Wallentine
July 13, 2015